**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>GARY R. CLASBY and KATHLEEN D. CLASBY,<br><br>Debtors. | Bankruptcy Case No. 23-12658 TBM<br>Chapter 11 |
| MATTHEW FULLER and CASSANDRA FULLER and<br><br>Plaintiffs,<br><br>v.<br><br>GARY R. CLASBY and KATHLEEN D. CLASBY,<br><br>Defendants. | Adv. Pro. No. 23-1212 TBM |

---

**MEMORANDUM OPINION AFTER TRIAL**

---

## I.   Introduction.

Bankruptcy provides a temporary safe haven for "honest but unfortunate debtor[s]"[1] so that they "can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."[2]  The foundation of American insolvency law is the possibility of a discharge which provides a "fresh start" — an economic second chance which acts as a sort of safety valve in our capitalist system.  However, not all debtors are entitled to a discharge.  The Bankruptcy Code[3] "has long prohibited debtors from discharging liabilities incurred on account of their fraud . . . ."[4]

---

[1]      *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'").

[2]      *Grogan,* 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (internal quotation omitted)).

[3]      11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[4]      *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998).

Those few debtors who engage in pre-bankruptcy dishonesty (including false pretenses false representations, or actual fraud), defalcation while acting in a fiduciary capacity, or willful and malicious injury must continue to bear responsibility for the damages resulting from their misconduct.

This dispute requires the Court to decide:  (1) whether two debtors who filed for bankruptcy protection under Chapter 11, Gary R. Clasby ("Mr. Clasby") and Kathleen D. Clasby ("Mrs. Clasby") (together, the "Defendants"), owe a debt to Matthew Fuller ("Mr. Fuller") and Cassandra Fuller ("Mrs. Fuller") (together, the "Plaintiffs"); and (2) if so, whether such debt is nondischargeable under Sections 523(a)(2)(A) ("false pretenses, false representations, or actual fraud," 523(a)(4) ("defalcation while acting in a fiduciary capacity"), and/or 523(a)(6) ("willful and malicious injury") of the Bankruptcy Code.

## II.     <u>Jurisdiction and Venue</u>.

This Court has subject matter jurisdiction to adjudicate this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B) ("allowance or disallowance of claims against the estate") and (b)(2)(I) ("determinations as to the dischargeability of particular debts").  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Furthermore, the parties have expressly consented to the Court's exercise of jurisdiction and entry of final judgment on the remaining claims and defenses asserted in the Complaint and Answer.  They did so in their "Joint Report" submitted on December 15, 2023, as well as at the pretrial Scheduling Conference conducted on December 21, 2023.  (Docket Nos. 13 and 14.)[5]

## III.     <u>Procedural History</u>.[6]

## A.     <u>The Main Bankruptcy Case</u>.

The Defendants, Gary R. Clasby and Kathleen D. Clasby, filed for bankruptcy protection under Chapter 11 Subchapter V of the Bankruptcy Code on June 16, 2023 (the "Petition Date").  (Main Case Docket No. 1.)  On their Amended Schedule E/F, the Defendants identified the Plaintiffs as holders of a "business debt" owed by the Defendants in the amount of "unknown."  (Main Case Docket No. 32 at 22.)  The Plaintiffs did not assert that the debt was "contingent," "unliquidated," or "disputed."  (*Id.*)

The Main Case has been hotly contested as between the Defendants and their creditors.  The Defendants filed a series of five Chapter 11 reorganization plans.  (Main Case Docket Nos. 53, 120, 201, 253 and 336.)  The Defendants' Chapter 11 plans all

---

[5]    Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for this Adversary Proceeding, using the convention: "Docket No. ___."  Similarly, the Court will refer to specific documents from the CM/ECF docket for the main bankruptcy case *In re Gary R. Clasby and Kathleen D. Clasby*, Bankruptcy Case No. 23-12658 (Bankr. D. Colo.) (the "Main Case") using the convention:  "Main Case Docket No. ___."

[6]    The Court takes judicial notice of the docket in this Adversary Proceeding as well as in the Main Case.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and the facts that are part of public records).

drew numerous objections and were rejected by general unsecured creditors.  However, the Court recently confirmed the Defendants' "Third Amended Subchapter V Plan of Reorganization."  (Main Case Docket No. 336 and 337.)

**B.**  **The Adversary Proceeding.**

The Plaintiffs commenced this Adversary Proceeding by filing a "Complaint to Determine Debt and Dischargeability of Debt and Objection to Debtor's Discharge" on September 14, 2023.  (Docket No. 1, the "Complaint.")  In the Complaint, the Plaintiffs alleged that the Defendants are indebted to the Plaintiffs in relation to a failed residential construction project.  Furthermore, the Plaintiffs asserted that such debt is nondischargeable.  The Complaint states the following claims: (1) the First Claim for Relief is for nondischargeability of the debt under Section 523(a)(2)(A) for "fraud and misrepresentation"; (2) the Second Claim for Relief is for nondischargeability of debt under Section 523(a)(2)(A) for "false pretenses"; (3) the Third Claim for Relief is for nondischargeability of debt under Section 523(a)(4) and 523(a)(6) for "defalcation while acting in a fiduciary capacity," "civil theft," and "willful and malicious injury"; (4) the Fourth Claim for Relief is for nondischargeability of debt under Section 523(a)(2)(A) and assets that the Defendants "are liable for the fraud of the other."

Thereafter, the Defendants submitted their "Answer to Adversary Complaint, wherein they denied liability to the Plaintiffs for any debt.  (Docket No. 5, the "Answer.")  The Defendants also asserted that the debt they may owe to the Plaintiffs (if any) is dischargeable through the bankruptcy process.  The Court entered a "Scheduling Order" and set the dispute framed by the Complaint and Answer for trial.  (Docket No. 16, the "Scheduling Order.")  Further, the Court set a dispositive motions deadline but cautioned that "if either side intends to file a dispositive motion, that Party should do so earlier in the case rather than later. If such a Motion were filed at or near the dispositive motion deadline, the Court might be unable to consider it in advance of the trial.  If that were to occur, the Court would use such submissions as trial briefs."  (*Id*. at 3.)

On July 5, 2024 (the last day for filing dispositive motions under the Scheduling Order), the Plaintiffs filed their "Motion for Summary Judgment Including Memorandum of Law."  (Docket No. 34, the "Motion for Summary Judgment.")  After securing an extension of time to respond, the Defendants submitted a "Response in Opposition to Motion for Summary Judgment."  (Docket No. 38, the "Response.")  The Plaintiffs filed a "Reply in Support of Motion for Summary Judgment."  (Docket No. 54, the "Reply.")  Thus, the Motion for Summary Judgment was not fully briefed until August 9, 2024 — a mere week before the long-scheduled trial.  The Court was not able to adjudicate the Motion for Summary Judgment, Response, and Reply in the one-week interval before the trial.

On August 8, 2024, the Plaintiffs and the Defendants submitted their "Stipulated Facts and Exhibits" wherein the parties stipulated to nine facts and a host of exhibits. (Docket No. 53, the "Stipulated Facts.")  The same day, the Plaintiffs and the Defendants also presented a helpful "Pretrial Statement" summarizing the claims and defenses, issues in dispute, and points of law.  (Docket No. 52.)

The Court conducted a one-day trial on the Complaint and Answer as scheduled on August 16, 2024.  At the commencement of the trial, the Court advised (consistent with the Scheduling Order) that the Court was unable to adjudicate the Motion for Summary Judgment, Response, and Reply because they were submitted so close to the trial date and, accordingly, the Motion for Summary Judgment, Response, and Reply would be considered as trial briefs.  Having completed the trial on the merits and issued this Memorandum Opinion After Trial, the Court denies the Motion for Summary Judgment as effectively moot.

At trial, the Court heard opening statements from counsel for the Plaintiffs and Defendants followed by testimony from four witnesses:  Cassandra Fuller; Gary R. Clasby; David Tressler; and David Knuth.  The Court also admitted into evidence Plaintiffs' Exhibits 5, 6, 8, 9, 12-15, 17-21, 23, and 26 as well as Defendants' Exhibits D, H, K, M, O, R, FF, and JJ.  After the conclusion of the evidence, the Court heard closing argument from counsel for the Plaintiffs and Defendants.

The Court, having considered the evidence presented at the trial (including the testimony and admitted exhibits), the Stipulated Facts, and the arguments presented by the parties at trial and in their briefs, determines that the dispute is ripe for decision.

## IV.    Findings of Fact.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 based upon the evidence presented at the trial (including the testimony and admitted exhibits) and the Stipulated Facts.

## A.    The Defendants and GEM Homes of Colorado, LLC.

The Defendants, Gary R. Clasby and Kathleen D. Clasby, are married Colorado residents.  They reside at 117 N. Candlewood Drive, Pueblo West, Colorado (the "Clasby Residence").  Mr. Clasby completed high school and attended trade school with a focus on mortuary science.  With respect to his job history, he worked as an embalmer in a funeral home and later served as a deputy coroner in Pueblo County.  He was exposed to the construction industry while in high school and dabbled in the area.  After leaving the funeral home and deputy coroner jobs, he began to work in construction full time.

At the beginning of the construction phase of Mr. Clasby's career — in 2017 — he joined forces with an acquaintance: David Knuth.  Together, they successfully built a pair of large commercial buildings (about 9,000 square feet each).  Subsequently, Mr. Clasby built about 20 residential homes and some barns.  He also remodeled numerous residences including by finishing or refinishing basements.  Meanwhile, Mrs. Clasby's main recent occupation has been as a self-employed sole proprietor of mail routes through the United States Postal Service.  (Main Case Docket No. 23 at 64.)

4

Somewhere along the way the Defendants started GEM Homes of Colorado, LLC ("GEM Homes"), a Colorado limited liability company.  According to the Defendants' Statement of Financial Affairs, the Defendants both worked with GEM Homes from December 2019 until they filed for bankruptcy protection on June 16, 2023. (Main Case Docket No. 23 at 7.)  Per the Defendants' Schedule A/B, the Defendants together owned all the membership interests in GEM Homes.  (Main Case Docket No. 23 at 16.)  The Court did not receive detailed evidence concerning the corporate formalities, formation, and operation of GEM Homes.  Although murky, the Court derives from the evidence that Gary Clasby mainly owned, controlled, and operated GEM Homes.  Mrs. Clasby also assisted as a bookkeeper and informal interior designer.  Two other individuals, David Knuth and Abdullah Alyazidi (also known as Mike Zidi), also has some role with GEM Homes but the exact nature of their involvement is unclear.  Although GEM Homes was involved in the construction industry, Mr. Clasby initially did not have a Colorado General Contractor License.  Since David Knuth did have a Colorado General Contractor License, GEM Homes operated using his license.  Then, Mr. Clasby obtained a Colorado General Contractor License in January 2021.

**B.    The Plaintiffs and the Muddy Creek Property.**

The Plaintiffs, Matthew Fuller and Cassandra Fuller, are married Indiana residents.  As of the commencement of the Adversary Proceeding, they resided in Goshen, Indiana.  Some years ago, they decided that they wanted to relocate to Colorado.  On January 31, 2020, Mrs. Fuller purchased real property known as:

> PAR 8 HATCHET RANCH PHASE I Rev 1 22-23-66;
> FORMERLY, 36-000-09-008, also known by street address
> of 6300 Muddy Creek Road.

(Stip. Fact No. 1.)  The Court refers to the foregoing real property as the "Muddy Creek Property."  A more fulsome legal description of the Muddy Creek Property was admitted into evidence as part of Exhibit 14.  The Muddy Creek Property is located southwest of Pueblo, Colorado and northeast of Colorado City, Colorado in a rural area on the west side of Interstate Highway No. 25.  When the Plaintiffs bought the Muddy Creek Property, it was vacant land with some scrub brush, bushes, and trees.  (Exs. 19 and 21.)  Although the Court did not receive specific evidence about the size of the Muddy Creek Property, the Court surmises that the Muddy Creek Property consists of at least several acres.  The Plaintiffs bought the Muddy Creek Property for $49,560.79.  (Stip. Fact No. 1.)

**C.    The Relationship Between the Plaintiffs, the Defendants and GEM Homes.**

The Plaintiffs decided to build a house for themselves on the Muddy Creek Property.  They selected a home site on a high point which, at the time, did not have an access road or driveway.  The Plaintiffs had no experience in home construction.

Someone referred the Plaintiffs to Mr. Clasby and GEM Homes.  On April 25, 2020, GEM Homes (acting through Mr. Clasby) provided the Plaintiffs with two construction cost quotations.  (Ex. D.)  The first cost quotation was for excavating and constructing a long "driveway" or "access road" (the witnesses used the terms interchangeably) of about 900 feet to the home site.  (The Court refers to the project as the "Access Road Project.")  GEM Homes referred to materials and equipment being supplied by a "General Contractor," even though Mr. Clasby was not a licensed Colorado General Contractor.  GEM Homes quoted a price of $18,900.00.  On the same day, April 25, 2020, GEM Homes (acting through Mr. Clasby) provided a second cost quotation for excavating and constructing a "new home" of "approximately 1,900 square feet with a two-car garage" without a well on the Muddy Creek Property.  (The Court refers to the project as the "Home Construction Project").  Again, GEM Homes referred to materials and equipment being supplied by a "General Contractor," even though Mr. Clasby was not a licensed Colorado General Contractor.  GEM Homes quoted a price of $332,500.00 (or $175.00 per square foot) for the Home Construction Project.  The Court assesses the Home Construction Project quotation as primarily informational because, at that stage, there were no specific architectural plans.  Mr. Clasby placed his name on the two construction cost quotations.

The Plaintiffs elected to proceed with the Access Road Project first.  Although the Court did not admit any written contract documents, Mrs. Fuller and Mr. Clasby both confirmed that GEM Homes was retained to construct the access road for the Plaintiffs in approximately April 2020 for $18,900.00.  GEM Homes ran into a few difficulties.  More culverts were required than estimated by GEM Homes.  And, the Plaintiffs asked for some additional work to complete a circular driveway near the anticipated home site.  Mr. Clasby did all the road construction work with heavy machinery.  GEM Homes completed the dirt access road in May 2020.  (See Ex. 19 (a photograph of a portion of the access road.))  Afterward, GEM Homes asked for $22,700.00 (an increase of $3,800.00 from the initial construct cost quotation) because of the extra unanticipated work.  The Plaintiffs were initially satisfied with the Access Road Project; so they paid $22,700.00 to GEM Homes.  In this Adversary Proceeding, the Plaintiffs do not claim that GEM Homes or the Defendants are indebted to the Plaintiffs in relation to the Access Road Project.

After completion of the Access Road Project, the Plaintiffs decided to proceed forward with the Home Construction Project on the Muddy Creek Property.  The Plaintiffs arranged for the San Isabel Electric Association, Inc. to extend electricity to the home site and paid the related changes:  $12,105.00.  Sometime between April and July 2020, the Plaintiffs or possibly GEM Homes retained an architect, Dave Weihrich of Advanced Design/Build, LLC ("Advanced Design"), to develop architectural plans for the Home Construction Project.  On July 30, 2020, Advanced Design provided the first architectural plan.  (Ex. 13 at 2.)[7]  Subsequently, Advanced Design made a series of

---

[7]     The Court also admitted into evidence as Exhibit H a "Preliminary Design for the Fuller Residence."  The document is undated and does not indicate that it was prepared by Advanced Design. The Court gives Exhibit H no weight because it is undated, it is unclear who prepared it and why, and there was no cogent testimony about Exhibit H..

"redline" changes on August 3, 2020, September 11, 2020, and March 28, 2021.  (*Id.*)
The last version of the architectural plans (dated March 28, 2021) was admitted into
evidence.  (Ex. 13.)  According to the final architectural plan, the Home Construction
Project consisted of a ranch-style residence with an interior ceiling height of nine feet
including: a kitchen, a dining room, a living room, a master bedroom, two other
bedrooms, a den/studio (with separate entrance), and a three-car garage.  (Ex. 13.)

**D.**     **The Home Construction Project and Contracts.**

On August 11, 2020, the Plaintiffs entered into a "Contractor Agreement" with
GEM Homes for the Home Construction Project.  (Ex. 5, the "First Contract.")  The First
Contract is sloppy and unprofessional.  It contains numerous errors, misspellings,
missing punctuation, and repeated provisions.

Regarding the "Scope of Work," the First Contract stated:  "The Contractor shall
furnish all of the materials and perform all of the work shown on the Drawings and/or
described in the Specifications entitled Exhibit A, as annexed hereto . . . ."  However,
the version of the First Contract admitted into evidence contained no attachments at all.
This is of some moment because Mr. Clasby testified that he believes that the First
Contract contemplated a two-car garage.  On the other hand, Mrs. Fuller testified that it
was always contemplated that the Home Construction Project would feature a three-car
garage.  Neither party provided any corroborating evidence.  For example, the Court did
not receive into evidence the architectural plans dated July 30, 2020 and August 3,
2020.  So, the Court simply has no way of knowing the real scope of the First Contract
(or even if any architectural plans were attached to the First Contract).

In any event, the First Contract required that GEM Homes would commence
work on the Home Construction Project no later than "august 11,2020" with substantial
completion by "December 30 2020."  Somewhat contradictorily, the First Contract
provided that "time is of the essence" but also that "time delays could occur do [sic] to
UN foreseen [sic] circumstances."

Moving to price, the First Contract stated that the Plaintiffs would pay GEM
Homes "for the material and labor to be performed under the Contract per Budget
Number per cost sheet approximately $317,045.00 subject to additions and deductions
pursuant to authorized change order."  The First Contract did not identify any "Budget
Number" or "cost sheet" and none were attached to the First Contract.  However, the
Court admitted into evidence a "Line Item Cost Breakdown," dated July 28, 2020, which
itemizes "Projected Costs" for the Home Construction Project and matches the
$317,045.00 price in the First Contract albeit with an added $15,000.00 "contingency."
(Ex. 6, the "Projected Cost Breakdown".)

Regarding the timing for payments, Article 4 of the the First Contract provided for
"Progress Payments":

> Payments of the Contract Price shall be paid in the manner
> following: upon receipt of the draw request by contractor final
> payment prior to certificate of occupancy.  All payments to
> be made to Gem Homes of Colorado.  Change to this
> standard, is as follows.  Final payment at closing.  Pre Draw
> at $51,000.00 (Wire Transfer) and Quick [sic] claim the deed
> to Property listed above to Gem Homes of Colorado.

The foregoing passage is hard to decipher.  Although titled "Progress Payments," it seems not to require any progress payments at all.  Instead, the passage appears to suggest that GEM Homes will make a single draw request ("the draw request") for final payment at the end ("final payment at closing").  But then someone is supposed to "Pre Draw at $51,000.00" and "Quick claim the deed" for the Muddy Creek Property to GEM Homes.  There is no such thing as a "quick claim" deed in Colorado.

The First Contract becomes more confusing in "Article 5. General Provisions." The first unnumbered clause of the General Provisions requires that "[a]ny alteration or deviation from the above specifications . . . will be executed only upon a written order for same, signed by Owner and Contractor . . . " which may necessitate additional charges.  Then follows a set of 17 subparagraphs numbered 1-14.  (The number confusion seems to have been caused mainly because GEM Homes repeated verbatim subparagraphs 2, 3, and 4 twice.)  Subparagraph No. 2 requires that "[t]he contractor [GEM Homes] shall furnish a plan and scale drawing showing the shape, size, dimensions, and construction and equipment specifications for home improvements, a description of work to be done and description of materials to be used . . . ."  So, GEM Homes undertook responsibility for the architectural drawings.  Subparagraph No. 3 states that "[t]o the extent required by law all work shall be performed by individuals duly licensed and authorized by law to perform such work."  Subparagraph No. 6 seems to restate the preamble but in different terms: "All change orders shall be in writing and signed by both Owner and Contractor, and shall be incorporated in, and become part of the contract."

At the end of the First Contract (Article 6) is this nugget of a sentence fragment: "Pre-approval letter for permanent financing from Integrity first Financial With Loan amount up to 380K for home located at 6300 muddy Creek".  Coupled with the earlier requirement that someone (probably the Plaintiffs) "quick claim the deed" for the Muddy Creek Property to GEM Homes, this makes little sense.  Who is supposed to get a "pre-approval letter" and when?  And, is this a condition precedent for the First Contract? Why and how are the Plaintiffs supposed to get financing if they are also supposed to divest their interest in the Muddy Creek Property?  None of the foregoing was explained in the First Contract.  The Court did receive some evidence answering the foregoing questions.  (As set forth below, the Plaintiffs later transferred the Muddy Creek Property to GEM Homes and also obtained pre-approval of financing.)  In any event, the Plaintiffs and Mr. Clasby (on behalf of GEM Homes) signed the First Contract.

8

Sometime after the First Contract was signed, the Plaintiffs sent $51,000.00 (by wire transfer) to GEM Homes.  (Stip. Fact No. 2.)  (The Court did not receive evidence of the specific date of transfer.)  Problems ensued.

Although the First Contract required GEM Homes to commence the Home Construction Project no later than August 11, 2020 (the same day as the date of the First Contract), the start was delayed.  The Building Permit for the Home Construction Project was not even issued by the Pueblo Regional Building Department until June 18, 2021.  (Exs. 17 and K.)

Meanwhile, at some point in December 2020, Mr. Clasby started clearing and excavating at the home site using his own heavy equipment.  The excavation took longer than anticipated because of the presence of shale which was unexpected by Mr. Clasby.  No subcontractors were utilized.  No other work was performed by GEM Homes and Mr. Clasby in 2020.  Mr. Clasby testified that he was "waiting for the quick claim deed" referenced in the First Contract to be provided by the Plaintiffs.  The Court finds such testimony not credible.  Mr. Clasby knew that the Plaintiffs were unsophisticated in real estate and construction matters and hailed from Indiana.  He could have not reasonably expected that the Plaintiffs would prepare a Colorado quit claim deed.  And, there is no corroborating evidence (such as letters, e-mails, notes, or texts) wherein Mr. Clasby indicated that he was "waiting" or delaying construction because of a missing quit claim deed.  Instead, unbeknownst to the Plaintiffs, Mr. Clasby and GEM Homes were in a precarious financial position on other construction projects and dealing with internal corporate strife.  In August 2020, GEM Homes applied for a short term $40,000.00 business loan from Momentum Business Capital.  (Ex. 8.) However, GEM Homes was rejected.  Meanwhile, Mrs. Fuller kept pushing Mr. Clasby to proceed with the Home Construction Project and he did not mention the quit claim deed being an impediment.

By late December 2020, it was apparent that GEM Homes would not complete the Home Construction Project by the December 30, 2020 deadline contained in the First Contract.  Charlotte McCormick, a real estate agent who worked frequently with Mr. Clasby, prepared a new "Contractor Agreement," dated December 28, 2020.  (Ex. 9, the "Second Contract.")  Although the Second Contract is in a different font than the First Contract, it is apparent that the First Contract is mostly a cut-and-paste of the First Contract.  The principal difference is that the substantial completion deadline for the Home Construction Project was changed from December 30, 2020 to June 30, 2021. The price stayed at $317,045.00.  All the other provisions are the same (except that some of the obvious errors and duplication were fixed).  The Second Contract was signed by the Plaintiffs.  Mrs. Clasby signed for GEM Homes as a "Member."  As with the First Contract, the referenced exhibits ("Drawings and/or described in Specifications entitled Exhibit A") were not attached.  Meanwhile, right before the Second Contract, the Fullers obtained a "Pre-Approval Letter" for the financing referenced in the Second Contract.

During the first months of 2021, for reasons unexplained to the Court, Mr. Clasby and GEM Homes did almost nothing on the Home Construction Project. On January 29, 2021, Mr. Clasby finally became a licensed Colorado General Contractor. Then, on April 6, 2021, Mrs. Fuller executed a "Quit Claim Deed" transferring the Muddy Creek Property to GEM Homes for no material consideration. (Ex. 14, the "Quit Claim Deed.") The Quit Claim Deed was recorded in the Pueblo County real property records a few days later. (Stip. Fact No. 6.) Why she gave up the Muddy Creek Property is a bit of a mystery. However, as best the Court understands, she transferred the Muddy Creek Property as some sort of financing scheme with GEM Homes. Apparently, the idea (seemingly shared by Mrs. Fuller and Mr. Clasby) was that GEM Homes would use the Muddy Creek Property to obtain financing to build the Home Construction Project and then, after completion, GEM Homes would sell the finished Home Construction Project back to the Plaintiffs — or something like that. It does not make a lot of sense.

Strangely, a few days before Mrs. Fuller executed the Quit Claim Deed, on April 1, 2021, the Plaintiffs also executed a "Contract to Buy and Sell Real Estate" with a Re/Max Associates real estate broker: Charlotte McCormick. (Ex. 12, the "Purchase Contract.") Under the Purchase Contract, the Plaintiffs agreed to buy the Muddy Creek Property from GEM Homes for $340,045.00 on June 30, 2021. Of course, that seems quite strange since Mrs. Fuller owned the Muddy Creek Property at that time, not GEM Homes. But the Plaintiffs signed up for the transaction anyway. Mrs. Clasby executed the Purchase Contract with GEM Homes. GEM Homes agreed to provide a credit for the $51,000.00 transfer made by the Fullers in the fall of 2020. (A few months later, on June 30, 2021, the Plaintiffs and GEM Homes executed an amendment to the Purchase Contract changing the closing date to November 30, 2021. (Ex. 18; Stip. Fact No. 9.))

The foregoing machinations led to a series of unfortunate subsequent events. On April 15, 2021, GEM Homes borrowed $190,000.00 from Steven C. Eller and Gloria G. Eller purportedly to assist in building the Home Construction Project. (Ex. 15; Stip. Fact No. 7.) GEM Homes mortgaged the Muddy Creek Property (through a Deed of Trust also dated April 15, 2021) to secure the new indebtedness. (Ex. 15.) Sometime thereafter, David Knuth (who had been affiliated with GEM Homes in some fashion) also caused GEM Homes to issue a promissory note to him which was secured by another Deed of Trust which David Knuth filed against the Muddy Creek Property. Thereafter, GEM Homes (and the Defendants) became embroiled in litigation against David Knuth and others. Eventually, the Plaintiffs also commenced a quiet title action with respect to the Muddy Creek Property claiming to be the owners. The Court was advised (and accepts) that the Clasbys caused GEM Homes to reconvey the Muddy Creek Property to Mrs. Fuller. So she is now the record owner of the Muddy Creek Property again. And, the Deed of Trust in favor of Steven C. Eller and Gloria G. Eller and against the Muddy Creek Property has been declared to be invalid by the Pueblo County District Court.

Meanwhile, digressing a bit, in the spring and summer of 2021, GEM Homes made a few sporadic efforts toward the Home Construction Projection. On May 6, 2021, someone ordered $58,163.19 of lumber for the Home Construction Project from

10

the Lowe's store in Pueblo, Colorado.  (Ex. M.)  The lumber was delivered to the Clasby Residence.  David Tressler, the framing supervisor for GEM Homes, testified that he and six "other guys" worked for "ten full days" in late May 2021 with the lumber at the Clasby Residence to prepare for the Home Construction Project.  Mainly, they "framed windows, door jams, and soffits" for the Home Construction Project.  Mr. Tressler led the effort using architectural plans from Advanced Design which included 9 feet ceilings, a three-car garage, and an "in-law suite."  He estimated that the labor was approximately $4,800.00 to $5,000.00 for the lumber work.  Mr. Tressler also visited the Muddy Creek Property in June 2021 to prepare for framing and installing the "framed windows, door jams, and soffits" along with the rest of the lumber.  Mr. Tressler confirmed that all the lumber was at the Clasby Residence in ready to go condition.  However, in late August 2021, Mr. Tressler was advised by Charlotte McCormick (the real estate agent) that the framing was no longer going forward.  Mr. Tressler no longer works with GEM Homes or the Defendants.  The Court found Mr. Tressler to be credible.  The lumber for the Home Construction Project is still located outside the Clasby Residence under some tarps.

In terms of other work, recall that in 2020, Mr. Clasby had conducted excavation at the home site.  On June 18, 2021, GEM Homes obtained a building permit for the Home Construction Project.  (Stip. Fact No. 8.)  In August 2021 (about a year after such excavation work), Mr. Clasby set up forms for the foundation.  The foundation for the Home Construction Project was completed (at least in substantial part) in September 2021 using concrete reinforced with rebar and a weather sealing.  (Ex. 21 (photograph showing foundation)).  GEM Homes apparently purchased the rebar from Castle Rebar and Supply Company on July 22, 2021 for $4,858.47.  (Ex. FF.)  GEM Homes hired Cortez Construction (as a subcontractor) to pour the concrete.  On November 5, 2021, Colorado Innovative Contractors, LLC (another entity owned and controlled by the Defendants) paid Cortez Construction $9,125.00 for the work.  (Ex. K.)  The Plaintiffs have acknowledged that the foundation has been completed.  (Ex. 20.)

So, there was a bit of progress on the Home Construction Project in the spring, summer, and fall of 2021.  But it was certainly not timely.  (Some of the delay may be attributed to Mr. Clasby being ill in August 2021.)  And, there was no possibility that the Home Construction Project would be completed by the then-current November 30, 2021 deadline.  By then, the Plaintiffs had had enough.  On October 22, 2021, the Plaintiffs' lawyer sent a demand letter to GEM Homes.  The Plaintiffs asked that GEM Homes: (1) reconvey title to the Muddy Creek Property back to them free of all encumbrances; (2) stop all on-site work that could result in mechanics liens; (3) return the $51,000.00 already paid by the Plaintiffs; (4) repair the access road; and (5) provide other relief. (Ex. 20.)  GEM Homes and Mr. Clasby stopped work on the Home Construction Project.

## E.   Use of $51,000.00 in Funds.

The Plaintiffs have complained that the Defendants have not provided a full accounting of the $51,000.00 in funds that the Plaintiffs sent to GEM Homes in approximately August 2020.  GEM Homes did not segregate the funds into a separate

account committed to the Home Construction Project.  Instead, the funds appear to have been co-mingled in GEM Home's financial accounts.

Mr. Clasby testified about the use of funds through a "Line Item Cost Breakdown."  (Ex. 23, the "Final Cost Breakdown.")  The Final Cost Breakdown generally follows the categories listed in the Projected Cost Breakdown (Ex. 6) but has more columns including "Borrower Costs Paid" and three duplicate "Amount Paid to Date."  The date on the last page of the Final Cost Breakdown is January 24, 2021.  However, Mr. Clasby testified that is incorrect and it was prepared more recently.

Section A of the Final Cost Breakdown covers "Pre-Construction Costs."  In the "Amount Paid to Date" column, Mr. Clasby identified 10 line items totaling $7,109.00.  Several of the entries are supported by corroborating information.  For example, the "Architect/Engineer/Plans" line lists $1,800.00 as paid.  The Defendants produced GEM Homes Check No. 1304 verifying the payment.  (Ex. K.)  The "Building Permit" line lists $1,104.00 as paid.  The Defendants produced GEM Homes Check No. 1308 verifying the payment.  (Ex. K.)  The "Septic Permit" line lists $950.00 as paid.  Although the Defendant's did not produce the corresponding check, they did provide a corroborating "Residential Permit Application."  (Ex. O.)  The "Septic Design" line lists $1,000.00 as paid.  Although the Defendant's did not produce the corresponding check, they did provide a corroborating "Septic Design Plan."  (Ex. R.)  Based upon the testimony and supporting information, the Court finds that GEM Homes paid $6,009.00 in costs for the Home Construction Project in the foregoing category of "Pre-Construction Costs."

Section C of the Final Cost Breakdown covers "Site Construction Costs."  In the "Amount Paid to Date" column, Mr. Clasby identified seven line items totaling $8,850.00.  None of the items are supported by corroborating information or testimony.  So, the Court does not accept that GEM Homes paid $8,850.00 in the foregoing category of "Site Construction Costs."

Section D of the Final Cost Breakdown covers "Site Preparation Costs."  In the "Amount Paid to Date" column, Mr. Clasby identified five line items totaling $28,975.00.  None of the items are supported by checks showing payment.  However, the Court received some corroborating and testimony.  Mr. Clasby testified that he cleared, graded, and excavated the home site.  He testified that the costs were higher than expected because of the presence of shale.  The line items are not for payments for subcontractors since Mr. Clasby performed all the work for GEM Homes.  Mr. Clasby's testimony is partially confirmed by photographic evidence of the foundation.  (Ex. 21.)  The Court determines that some clearing, grading, and excavation work was performed.  The Court received no evidence of "haul off" and "extra fill material" categories.  Accordingly, based upon the foregoing and the uncertainties in Mr. Clasby's testimony, the Court finds that Mr. Clasby (on behalf of GEM Homes) provided services valued at $11,700.00 for "Site Preparation Costs" (which amount is half of the line items for "Clearing" and "Rough Grade/Excavation") in the foregoing category.

Section E of the Final Cost Breakdown covers "Foundation."  In the "Amount Paid to Date" column, Mr. Clasby identified four line items totaling $19,865.00.  Several of the entries are supported by corroborating information.  For example, the "Foundation and Building Retaining Walls Poured" line lists $18,015.00 as paid.  The Defendants produced a check from Colorado Innovative Contractors, LLC showing that entity paid $9,125.00 to Cortez Construction for "foundation" concrete at the Muddy Creek Property.  (Ex. K.)  And, $4,858.47 of rebar was purchased.  (Ex. FF.)  The Court also received evidence that Mr. Clasby framed the foundation.  And, the water  proofing material is visible in a photograph.  (Ex. 21.)  The Plaintiffs have acknowledged that the foundation has been completed.  And, the aggregate of $19,865.00 for the foundation is similar to the Projected Cost Budget.  Based on the foregoing, the Court finds that GEM Homes paid $19,865.00 in costs to a subcontractor (Cortez Construction), material supplier (Castle Rebar and Supply Company), and for services provided in the category of "Foundation."

Section F of the Final Cost Breakdown covers "Building Rough-In."  In the "Amount Paid to Date" column, Mr. Clasby identified four-line items totaling $66,093.00.  Several of the entries are supported by corroborating information.  For example, the "Rough Framing Materials" line lists $45,000.00 as paid and the "Manufactured Trusses / Components" line lists $15,099.00 as paid.  This matches closely with the $58,163.19 of lumber purchased from the Lowes store in Pueblo, Colorado.  Mr. Clasby and Mr. Tressler both confirmed that the lumber was delivered.  The "Rough Framing Labor" lists $6,000.00.  This matches closely to Mr. Tressler's testimony concerning ten days of labor spent on framing work.  And, the testimony is that the lumber is still located at the Clasby Residence.  The testimony was corroborated with photographs.  (Ex. JJ.)  Based on the foregoing, the Court finds that GEM Homes paid $66,093.00 in costs to its employees/subcontractors and a material supplier (Lowes) in the foregoing category of "Building Rough-In."

The remainder of the Final Cost Breakdown does not list any other costs.  Accordingly, the Court finds that GEM Homes spent an aggregate of $103,667.00 in costs for permits, plans, third parties, materials suppliers, subcontractors, and its own labor associated with the Home Construction Project.

Importantly, the Court also finds that there are no unpaid subcontractors or materials suppliers related to the Home Construction Project.  Furthermore, no mechanics liens have been filed against the Muddy Creek Property.  Since the $51,000.00 in funds provided by the Fullers were not segregated, the Court cannot trace the $51,000.00 in funds dollar for dollar to the costs.  But, the Court finds that the aggregate costs paid by GEM Homes on the Home Construction Project exceed the $51,000.00 paid by the Plaintiffs (and, again, there are no unpaid subcontractors or materials suppliers).

13

**F.**    **The Plaintiffs' Recovery from David Knuth and Abdullah Alyazidi.**

The Plaintiffs previously sued David Knuth and Abdullah Alyazidi for unjust enrichment, breach of fiduciary duty, fraud, civil theft, conversion, and civil conspiracy in connection with the Home Construction Project and allegedly improper or spurious liens against the Muddy Creek Property.  Among other things, the Plaintiffs requested $51,000.00 in damages (the same $51,000.00 paid to GEM Homes) after the First Contract.  Although Mrs. Fuller testified that she was not certain (because of short term memory loss), she testified that the Plaintiffs recovered about $45,000.00 in a settlement with David Knuth and Abdullah Alyazidi.  Further, Mrs. Fuller now owns the Muddy Creek Property unencumbered.

**G**.    **GEM Homes Returned the Muddy Creek Property to Mrs. Fuller**.

As set forth above, on April 6, 2021, Mr. Fuller executed the Quit Claim Deed (Ex. 14) transferring the Muddy Creek Property to GEM Homes.  However, the parties now concur that the Muddy Creek Property has been reconveyed back to Mrs. Fuller and is free and clear of liens.

## V.    Legal Analysis and Conclusions.

**A.**    **General Legal Framework.**

In the Complaint, the Plaintiffs asserted four claims.  The First Claim for Relief is for nondischargeability of the debt under Section 523(a)(2)(A) for "fraud and misrepresentation."  The Second Claim for Relief is for nondischargeability of debt under Section 523(a)(2)(A) for "false pretenses."  The Third Claim for Relief is for nondischargeability of debt under Sections 523(a)(4) and 523(a)(6) for "defalcation while acting in a fiduciary capacity," "willful and malicious injury," and "civil theft" all stemming from an alleged violation of the Colorado Trust Fund Statute: COLO. REV. STAT. § 38-22-127 *et seq.* (the "Trust Fund Statute").  The Fourth Claim for Relief is for nondischargeability of debt under Section 523(a)(2)(A) and asserts that the Defendants "are liable for the fraud of the other" and "each of them was the agent and representative of [GEM Homes]."  Thus, all the claims advanced by the Plaintiffs ask for a determination on nondischargeability under some part of Section 523(a).

**1.**    **Statutory Text.**

The bankruptcy statutes relied upon by the Plaintiffs in the Complaint (Sections 523(a)(2)(a), (a)(4), and (a)(6)), provide:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . . .
>
> (2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —

14

> (A)   false pretenses, a false representation, or
> actual fraud, other than a statement respecting
> the debtor's or an insider's financial condition
> . . . .
>
> . . . .
>
> (4)   for fraud or defalcation while acting in a fiduciary capacity,
> embezzlement, or larceny . . . .
>
> (6)   for willful and malicious injury by the debtor to another entity or to
> the property of another entity.

11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(4).

**2.**   **Burden of Proof.**

The Plaintiffs bear the burden of establishing nondischargeability of a particular
debt under Section 523(a) by a preponderance of the evidence.  *Grogan*, 498 U.S. at
286-87 ("Requiring the creditor to establish by a preponderance of the evidence that his
claim is not dischargeable reflects a fair balance between these conflicting interests.");
*Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring
creditor to prove Section 523(a) claims by a preponderance of the evidence).
Additionally, exceptions to discharge under Section 523(a) "are to be narrowly
construed, and because of the fresh start objectives of bankruptcy, doubt is to be
resolved in the debtor's favor."  *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*,
125 F.3d 1358, 1361 (10th Cir. 1997).  *See also Sawaged v. Sawaged (In re Sawaged)*,
2011 WL 880464, at *3 (Bankr. D. Colo., Mar. 15, 2011) (same).

**3.**   **Nondischargeability Standard.**

All Section 523(a) nondischargeability claims require a two-part analysis.  First,
"the bankruptcy court must determine the validity of the debt under applicable law."
*Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *see also
Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003) (if the alleged debt is
for fraud, "state law of fraud controls with respect to whether fraud has occurred").  This
is referred to as the "claim on the debt" component.  *Thompson*, 555 B.R. at 8.  Second,
if there is a valid debt, "the bankruptcy court must determine the dischargeability of that
debt under Section 523."  *Id*.; *see also Lang*, 293 B.R. at 513 ("bankruptcy law controls
with respect to the determination of nondischargeability").  This is referred to as the
"dischargeability" component.  *Thompson*, 555 B.R. at 8.  There may be substantial
overlap between the "claim on the debt" and the "dischargeability" components,
especially with respect to allegations of fraud and misrepresentation.

**B.**    **The Plaintiffs Have Not Met Their Burden on their First Claim: "Fraud and Misrepresentation" Under Section 523(a)(2)(A).**

As noted above, Section 523(a)(2)(A) contains three subparts: (1) false pretenses; (2) false representation; or (3) actual fraud.  The title of the Plaintiffs' First Claim for Relief purports to pair two of the subparts together: "fraud and misrepresentation."  However, the text of the Plaintiffs' First Claim for Relief relies exclusively on "false representation" and never mentions "actual fraud."

**1.**    **The Plaintiffs Have Not Established the Validity of the Debt**.

The first nondischargeability exercise is for "the bankruptcy court [to] determine the validity of the debt under applicable law."  *Thompson*, 555 B.R. at 8.  If the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred." *Lang*, 293 B.R. at 513; *see also Grogan*, 498 U.S. at 283 ("The validity of a creditor's claim is determined by rules of state law.").

Fraud is an intentional tort that has been recognized in Colorado since Statehood.  *See Wheeler v. Dunn*, 22 P. 827, 833 (Colo. 1889) (identifying elements of fraud by misrepresentation claim).  "[T]he constituents of fraud, though manifesting themselves in a multitude of forms, are so well recognized that they may be said to be elementary."  *Morrison v. Goodspeed*, 68 P.2d 458, 477 (Colo. 1937).  The Colorado Supreme Court repeatedly has confirmed the legal elements required for establishing a fraud claim based upon misrepresentation:

> (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) representation made with intention that it be acted upon; and (5) representation resulting in damage.

*Kinsey v. Preeson*, 746 P.2d 542, 550 (Colo. 1987) (citing *Trimble v. City and Cty. of Denver*, 697 P.2d 716 (Colo. 1985)).  *See also Concord Realty Co. v. Cont'l Funding Corp.*, 776 P.2d 1114, 1118 (Colo. 1989) (same list of fraud elements); *Brody v. Bock*, 897 P.2d 769, 775-76 (Colo. 1995) (same); *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (same); *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (same); *Bristol Bay Prods., LLC v. Lampack,* 312 P.3d 1155, 1160 (Colo. 2013) (same).  Although often described as a five-part test, the fifth element of fraud — damages — contains further requirements.  The Colorado Supreme Court confirmed that the damages element should be "unpack[ed] . . . into its three discrete sub-parts, requiring the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages.  *Bristol Bay*, 312 P.3d at 1160 (citing Colorado Jury Instructions – Civil. 19:1 (2013) (listing seven requirements for fraud instead of five elements).  Federal courts applying Colorado law also rely upon the

same formulation of fraud.  *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 569 F. Supp.2d 1135, 1140 (D. Colo. 2008).

### a. The Plaintiffs Failed to Prove Actionable False Representations.

During Closing Argument, counsel for the Plaintiffs identified the following as the alleged false representations at issue:

- ". . . the misrepresentation was that . . . GEM Homes . . . was going to use the Fuller's funds for building their house . . . ."

- The Defendants "lied on ability to build [the Home Construction Project] . . . ."

- The Defendants "lied about completing [the Home Construction Project] on time . . . ."

Further, counsel for the Plaintiffs confirmed that those were the *only* alleged false representations the Court needed to consider.[8]  The Court refers to the foregoing as the "Alleged Misrepresentations."

There is a fundamental problem with the Plaintiffs' position.  None of the three Alleged Misrepresentations constitute a misrepresentation about a "material existing fact."  *Kinsey,* 746 P.2d at 550 (fraud requires "a false representation of a material existing fact").  Instead, the Alleged Misrepresentations are merely promises of future conduct or performance and do not involve a "material existing fact."  As the Court observed in *Together Real Estate Holdings, LLC v. Roberts (In re Roberts)*, 2023 WL 2565721, at * 19 (Bankr. D. Colo. Mar. 17, 2023):

> "In the normal course of events, the failure to perform a future obligation as promised is a mere breach of contract." *Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 51 (Bankr. D. Colo. 2013).  Indeed, "a promise or declaration, standing alone, is insufficient to support a claim under § 523(a)(2)(A),

---

[8]      The Alleged Misrepresentations identified by the Plaintiffs' counsel in Closing Argument match closely with what the Plaintiffs alleged in the Complaint:

> Clasbys' actions in securing title and funds from Fullers were accompanied by the false representations of then existing facts set forth herein including the promises to use Fullers' funds for construction of Fullers' home, complete construction by the stated deadline and at the stated price, and reconvey title to the Property as promised, and at the promised date, which were known by Clasbys to be false representations of then existing fact . . . .

(Compl. ¶ 32.)

because a promise to perform some act in the future, without more, does not constitute a representation for purposes of § 523(a)(2)(A)." *Andresen & Arronte, PLLC v. Hill (In re Hill)*, 425 B.R. 766, 775 (Bankr. W.D.N.C. 2010). Even an intentional breach of contract is not a fraud as contemplated by Section 523(a)(2)(A). *Id.* There is an exception. "[W]hen a promise of future performance is made by one who has no present intention of performing the promise, it is a misrepresentation that may be found to be fraudulent." *Wagner*, 492 B.R. at 51 (citing RESTATEMENT (SECOND) OF TORTS § 530 (1977) and *In re Kukuk*, 225 B.R. 778, 785-86 (10th Cir. BAP 1998)) (emphasis added); *see also Lin v. Pacheco (In re Pacheco)*, 2021 WL 5985178, at *7 (Bankr. D. Utah. Dec. 16, 2021) ("a debtor's representations of his intentions may constitute a false representation . . . if when the representation was made, the debtor had no intention of performing as promised.").

*Roberts*, 2023 WL 2565721, at *19.

The Court received no evidence that when the Defendants made the Alleged Misrepresentations, they had the then-present intention to not do as they had promised. In fact, the evidence at trial showed that the Defendants and GEM Homes initially intended to perform the Home Construction Project. After all, GEM Homes was in the business of constructing homes and other buildings and had done so, with some success, for several years. Evidence of the subsequent conduct of the Defendants and GEM Homes also reinforces that the Defendants did not make the Alleged Misrepresentations with the then-present intention to not follow through with the Home Construction Project. GEM Homes obtained a building permit for the Home Construction Project. As set forth above and below, GEM Homes also paid costs or provided services in the amount of $103,667.00 toward completing the Home Construction Project. Such amount was more than the Plaintiffs paid. GEM Homes performed substantial work as apparent by the grading and completed foundation. If the Defendants and GEM Homes had not intended to complete the Home Construction Project from the get-go, they would not have performed as they did. It is true that, in the end, GEM Homes did not complete the Home Construction Project on time. But, that amounts to nothing more than a possible breach of contract against GEM Homes, not actionable misrepresentations by the Defendants.

### b.   The Plaintiffs Failed to Prove Damages.

Although the Plaintiffs' failure to prove an actionable "false representation of a material existing fact," defeats the Plaintiffs' fraud-based claim under Colorado law, the Plaintiffs also failed to establish damages. During Closing Argument, counsel for the Plaintiffs stated repeatedly that the Plaintiffs were seeking damages of $51,000.00

(trebled under the Trust Fund Statute to $153,000.00) plus attorneys' fees and costs.[9] The Plaintiffs did send GEM Homes $51,000.00 by wire transfer sometime after the First Contract (which was dated August 11, 2020).  The Court refers to the foregoing as the "Wire Transfer."  (The Plaintiffs did not provide evidence of the specific date of the Wire Transfer.)  So, it appears that the Plaintiffs' entire damages calculus is built *only* on the $51,000.00 Wire Transfer.  (The Plaintiffs did not assert a breach of contract claim against the Defendants who, after all, were not themselves parties to the First Contract, Second Contract, or Purchase Contract.)

After the Wire Transfer, GEM Homes paid costs or provided services toward completion of the Home Construction Project at least as follows:

- $6,009.00 in the category of "Pre-Construction Costs";

- $11,700.00 in the category of "Site Preparation Costs";

- $19,865.00 in the category of "Foundation"; and

- $66,093.00 in the category of "Building Rough-In"

The foregoing totals to $103,667.00 for permits, plans, third parties, materials suppliers, subcontractors, and its own labor.  In addition, Mrs. Fuller owns the Muddy Creek Property free and clear of liens or encumbrances.  There are no mechanics liens against the Muddy Creek Property because all materialmen and suppliers were paid. As such, if the Plainitiffs intended to assert GEM Homes' failure to reconvey the Muddy Creek Property to Mrs. Fuller, that "injury" was remedied. Moreover, the Muddy Creek Property has been graded.  The foundation for the Home Construction project was completed.  So, GEM Homes provided value to the Plaintiffs far in excess of the $51,000.00 Wire Transfer.  Furthermore, the Plaintiffs previously sued David Knuth and Abdullah Alyazidi for the same $51,000.00 in damages and recovered approximately $45,000.00. Under such circumstances, the Plaintiffs have failed to prove any fraud-oriented damages let alone damages in the amount of $51,000.00 trebled.

### 2.   The Plaintiffs Have Not Established Nondischargeability under Section 523(a)(2)(A).

Assuming for the moment that the Plaintiffs had been able to prove some amount of damages (which they did not), then, the Court would be required to assess the "dischargeability" component — is the valid debt nondischargeable under Section 523(a)(2)(A)?  *Thompson*, 555 B.R. at 8.  To establish nondischargeability on grounds of misrepresentation pursuant to Section 523(a)(2)(A), the Plaintiffs must prove the following elements by a preponderance of the evidence:

---

[9]   In the Complaint, the Plaintiffs asked for "not less than $135,847.79."  (Compl. ¶¶ 42, 48, 56, and 66.)  During the trial, the Plaintiffs did not provide any evidence or argument to support such figure. Instead, counsel for the Plaintiffs relied only on $51,000.00 trebled.

> (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was [justifiable][10]; and (5) the false representation resulted in damages to the creditor.

*Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *see also Field v. Mans*, 516 U.S. 59, 74-75 (1995); *Riebesell v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).  Further, the false representation must be "other than a statement respecting the debtor's or an insider's financial condition."

The foregoing hews very closely to the requirements for establishing a fraud claim based upon misrepresentation as a matter of Colorado state law.  *Kinsey*, 746 P.2d at 550; *Concord Realty Co.*, 776 P.2d at 1118; *Brody*, 897 P.2d at 775-76; *Coors*, 112 P.3d at 66; *Vinton*, 269 P.3d at 1247; *Bristol Bay Prods., LLC*, 312 P.3d at 1160. So, for the same reasons already set forth above (the lack of actionable fraudulent misrepresentations of material existing facts and failure of damages), the Court finds that the Plaintiffs failed the Section 523(a)(2)(A) "false representation" test too. Additionally, the Plaintiffs also did not prove the requisite "intent to deceive."

 The title of the First Claim for Relief makes a reference to "fraud" as well as "misrepresentation."  "Actual fraud" is a basis for nondischargeability under Section 523(a)(2)(A).  However, the Plaintiffs made no serious effort to develop an "actual fraud" claim separate from "misrepresentation."  In fact, the text of the First Claim for Relief never mentions "actual fraud."  However, in Closing Argument counsel for the Plaintiffs made a passing reference to "actual fraud."

Recently, the United States Supreme Court defined the parameters of the "actual fraud" part of Section 523(a)(2)(A).  In *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356 (2016), the Supreme Court stated:

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involv[es] moral turpitude or intentional wrong." . . .  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or morality." . . . Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id*. at 360 (citations omitted).  The term "fraud" does not lend to a single and simple definition:

---

[10]     In *Fowler Brothers*, 91 F.3d at 1373, the Tenth Circuit states that the reliance must be "reasonable."  However, that does not mean "'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's representation."  *Riebesell*, 586 F.3d at 791. Instead, under *Field v. Mans*, 516 U.S. 59, 74-75 (1995), the reliance must be "justifiable."

> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely. *See* 1 J. Story, Commentaries on Equity Jurisprudence § 189, p. 221 (6th ed. 1853) (Story) ("Fraud ... being so various in its nature, and so extensive in its application to human concerns, it would be difficult to enumerate all the instances in which Courts of Equity will grant relief under this head"). There is no need to adopt a definition for all times and all circumstances here . . . .

*Id.*

To the extent that the Plaintiffs adequately pled the "actual fraud" part of Section 523(a)(2)(A) in the First Claim for Relief, the Court rejects the claim. First, the Plaintiffs have not identified any "actual fraud" allegedly committed by the Defendants apart from the Alleged Misrepresentations. But the Court has already determined that the Alleged Misrepresentations are not actionable because, among other things: the Alleged Misrepresentations are not false representations of material existing facts and the Plaintiffs did not establish damages.

In any event, the Plaintiffs also missed in proving intent. One of the key "actual fraud" requirements is to show that the Defendants engaged in "moral turpitude or intentional wrong." *Husky Int'l Elecs.*, 578 U.S. at 360. The Court ascertains no evidence proving that the Defendants engaged in "moral turpitude or intentional wrong." GEM Homes successfully completed the Access Road Project. Then, GEM Homes entered into the First Contract, Second Contract, and Purchase Contract. The series of contracts were all poorly drafted and unclear. The Plaintiffs paid the $51,000.00 Wire Transfer to GEM Homes. Then, GEM Homes paid costs or provided services toward completion of the Home Construction Project with a value of $103,667.00 — more than the Wire Transfer. GEM Homes did not perform in a timely fashion and plainly had poor internal accounting, but that does not establish "moral turpitude or intentional wrong" sufficient for an "actual fraud" nondischargeability claim against the Defendants. Thus, the Court determines that the Plaintiffs have not met their preponderance of the evidence burden to show a "false representation" or "actual fraud" under Section 523(a)(2)(A).

**B.** **The Plaintiffs Have Not Met Their Burden on their Second Claim: "False Pretenses" Under Section 523(a)(2)(A).**

As noted above, Section 523(a)(2)(A) contains three subparts: (1) false pretenses; (2) false representation; or (3) actual fraud. The title of the Plaintiffs' Second Claim for Relief deals with one of the subparts: "false pretenses."

1. <u>**The Plaintiffs Have Not Established the Validity of the Debt**</u>.

As set forth above, the Plaintiffs have not proven the validity of debt for any fraud-oriented claim. *Thompson*, 555 B.R. at 8 (first, "the bankruptcy court must determine the validity of the debt under applicable law."). Given the failure to prove a valid debt, the Second Claim for Relief also fails.

2. <u>**The Plaintiffs Have Not Established Nondischargeability under Section 523(a)(2)(A).**</u>

Assuming for the moment that the Plaintiffs had been able to prove some amount of damages (which they did not), then, the Court would be required to assess the "dischargeability" component — is the valid debt nondischargeable under Section 523(a)(2)(A)? *Thompson*, 555 B.R. at 8. The statutory phrase "false pretenses" is defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Munoz*, 536 B.R. at 884 n.12; *see also FIA Card Servs., N.A. v. Quinn (In re Quinn)*, 492 B.R. 341, 345 (Bankr. N.D. Ga. 2013) ("False pretenses is defined as '[A] series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.'"). Like a false representation or actual fraud claim, a false pretenses claim also requires intentional misconduct by the debtor.

In the Complaint, the Plaintiffs asserted that their false pretenses claim was based on the following:

> Clasbys mislead Fullers with false pretenses by telling Fullers that [GEM Homes'] financial condition was good and [GEM Homes] could build the home and return title to Fullers as agreed and on schedule, and by contractually agreeing with Fullers in writing, that Clasbys would use the $51,000 wire transferred by Fullers for initial construction costs, would complete construction of the house on time and on budget, and had the license and funding required to construct the home, all of which statements were made with the intent to deceive Fullers.
>
> Fullers reasonably relied on these materially false statements made verbally and in writing respecting [GEM Homes'] financial condition and licensing . . . .

(Compl. ¶¶ 45 and 46.)

Most of the foregoing is simply a rehash of the same alleged misrepresentations and fraud asserted in the First Claim for Relief.  But, there are a few different contentions.  The Plaintiffs assert that the Defendants told the Plaintiffs that: (1) GEM Homes' "financial condition was good"; and (2) GEM Homes "had the license and funding required to construct the home."  With respect to these different allegations, the Plaintiffs failed to prove that the Defendants touted GEM Homes' financial condition as "good" to the Plaintiffs.  No evidence was adduced showing a communication between the parties on that topic.  Similarly, the Plaintiffs did not introduce any evidence that the Defendants told the Plaintiffs that GEM Home "had the license and funding required to construct the home."  However, the First Contract and Second Contract stated: "[t]o the extent required by law all work shall be performed by individuals duly licensed and authorized by law to perform such work."   With respect to the license topic, the evidence established that David Knuth had a Colorado General Contractor's License when the First Contract was executed.  He worked with GEM Homes and generally "pulled permits" for GEM Homes projects prior to Mr. Clasby obtaining his own Colorado General Contractor's License in January 2021.  So, there is no evidence that GEM Homes was "unlicensed" at any time.  And, regarding funding, there was no evidence provided during the trial that the Debtors told the Plaintiffs that they had the "funding"  In fact, the First Contract states:  "Pre-approval letter for permanent financing from Integrity first Financial With Loan amount up to 380K for home located at 6300 muddy Creek."  This condition in the First Contract belies the contention that GEM Homes had "funding."  In any event, there was a fundamental failure of proof by the Plaintiffs on the licensure and funding topics.

Having considered all the foregoing, the Court ascertains no false pretenses.  At worst, the GEM Homes and the Plaintiffs entered into a poorly drafted set of contracts, GEM Homes built part of the Home Construction Project, the Plaintiffs sent the $51,000.00 Wire Transfer to GEM Homes, GEM Homes paid costs or provided services toward completion of the Home Construction Project with a value of $103,667.00, and the Home Construction Project was not completed.  That does not prove Section 523(a)(2)(A) false pretenses against the Defendants.  Accordingly, the Court determines that the Plaintiffs have not met their preponderance of the evidence burden to show false pretenses under Section 523(a)(2)(A).

## C.   The Plaintiffs Have Not Met Their Burden on their Third Claim Under Sections 523(a)(4) and (a)(6).

The Third Claim for Relief is for nondischargeability of debt under Sections 523(a)(4) and 523(a)(6) for "defalcation while acting in a fiduciary capacity," "willful and malicious injury," and "civil theft," all stemming from an alleged violation of the Trust Fund Statute.

### 1.   The Plaintiffs Have Not Established the Validity of the Debt.

The Third Claim for Relief is premised on the $51,000.00 Wire Transfer.  As set forth above, the Plaintiffs generally have not proven the validity of a $51,000.00 debt for

under fraud-oriented theories.  *Thompson*, 555 B.R. at 8 (first, "the bankruptcy court must determine the validity of the debt under applicable law.").  However, the Third Claim for Relief purports to tether liability to the Trust Fund Statute.

The Trust Fund Statute states:

> (1)     All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.
> . . . .
>
> (4)     Every contractor or subcontractor shall maintain separate records of account for each project or contract, but nothing contained in this section shall be construed as requiring a contractor or subcontractor to deposit trust funds from a single project in a separate bank account solely for that project so long as trust funds are not expended in a manner prohibited by this section.
>
> (5)     Any person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18-4-401, C.R.S.

COLO. REV. STAT. § 38-22-127.  And, an individual "in complete control of the finances and financial decisions of an entity which violated the Trust Fund Statute is personally liable for such violation."  *Pritchard Concrete, Inc. v. Barnes (In re Barnes)*, 377 B.R. 289, 298 (Bankr. D. Colo. 2007); *Alexander Co. v. Packard*, 754 P.2d 780, 781 (Colo. App. 1988).

The purpose of the Trust Fund Statute is patent in the text:  to protect "subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor" from not receiving payment.  COLO. REV. STAT. § 38-22-127(1); *see also Flooring Design Assoc., Inc. v. Novick*, 923 P.2d 216, 219 (Colo. App. 1996) ("the overriding purpose of the mechanics' lien law is to benefit and protect subcontractors, material providers, and laborers").  However, another important purpose of the Trust Fund Statute is to protect property owners.  As explained by the Colorado Supreme Court:

> [P]roperty owners *are* direct beneficiaries of the Trust Fund Statute to prevent the possibility of having to make double

24

payments.  *In re Walker,* 325 B.R. 598, 602 (D. Colo. 2005). When an owner pays a contractor and then a subcontractor places a lien on the owner's property, the owner is faced with the possibility of having to also pay the subcontractor to clear the lien cloud from the property.  *Id.*

In contrast, the Trust Fund Statute assures property owners that they will not have to pay a second time to satisfy the subcontractor.  In fact, the primary concern of the legislature, at the time the Trust Fund Statute was passed, was the protection of *property owners* against unscrupulous contractors . . . .

*Fowler & Peth, Inc. v. Regan (In re Regan)*, 151 P.3d 1281, 1286 (Colo. 2007) (emphasis in original); *see also Yale v. AC Excavating, Inc.*, 295 P.3d 470, 475 (Colo. 2013) ("The trust obligation protects owners from having to pay for labor or materials twice in an effort to avoid mechanics' liens if a dishonest contractor collects an initial payment from the owner but fails to pay a subcontractor, laborer, or supplier . . . .").

Based on the foregoing, the Court questions the application of the Trust Fund Statute to the current dispute.  After all, Mrs. Fuller owns the Muddy Creek Property. The Muddy Creek Property is free and clear of encumbrances.  GEM Homes (in its role as contractor) received the $51,000.00 Wire Transfer for the Home Construction Project.  Then, GEM Homes paid costs or provided services toward completion of the Home Construction Project with a value of $103,667.00 (which obviously is in excess of the Wire Transfer).  The Home Construction Project was partially built but not completed.  However, all "subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor" have been paid.  No mechanics liens have been asserted against the Muddy Creek Property.  So, it is apparent that there has been no violation of the "trust" in the standard sense under Colo. Rev. Stat. § 38-22-127(1); *see also ASCI Readi-Mix v. Gamboa (In re Gamboa)*, 400 B.R. 784, 790 (Bankr. D. Colo. 2008) ("until the workers and vendors on a particular project were paid in full, all builder funds disbursed on that project had to go to workers and vendors on that project.").

As best the Court understands the Plaintiffs' position, the Plaintiffs appear to be relying on an "accounting" theory premised exclusively on Colo. Rev. Stat. § 38-22-127(5).  That provision requires that contractors "shall maintain separate records of account for each project or contract."  However, there is no requirement that contractors establish separate or segregated financial accounts for each project.  *Id.*; *Gamboa*, 400 B.R. at 789 ("There was nothing improper in [contractor's] use of a single bank account . . . .").  GEM Homes deposited the $51,000.00 in its general operating account.  So, those funds were comingled with other funds.  Although that may not have been wise, the Trust Fund Statute does not prohibit co-mingling of funds.  Instead, the statute only demands that contractors "shall maintain separate records of account for each project

or contract." The Trust Fund Statute does not specify the exact nature of the required "records of account."

In this case, the Plaintiffs have been frustrated (perhaps rightly so) with the failure of GEM Homes to provide "records of account" to the Plaintiffs during earlier stages of the dispute. However, at trial, the Defendants provided a written Final Cost Breakdown detailing expenditures on the Home Construction Project by category and amounts. The Final Cost Breakdown is detailed. The Defendants also produced supporting evidence at the trial including checks from GEM Homes and/or affiliates, paid permit applications, design plans, photographs, receipts for payments for subcontractors and materials, and testimony. The Final Cost Breakdown and corroborating evidence established that GEM Homes spent an aggregate of $103,667.00 in costs for permits, plans, third parties, materials suppliers, subcontractors, and its own labor associated with the Home Construction Project. (To the extent that entries on the Final Cost Breakdown were not corroborated by other evidence, the Court did not accept such entries.) GEM Homes' accounting practices were by no means a model for construction accounting. However, by the close of evidence, the Court and the Plaintiffs received "records of account" — the Final Cost Breakdown and supporting materials — proving that GEM Homes spent much more (about double) on the Home Construction Project than the $51,000.00 Wire Transfer received from the Plaintiffs. Accordingly, the Court determines that there was no violation of the Trust Fund Statute by the Debtors with respect to the $51,000.00 Wire Transfer.

Given the failure to establish damages under the Trust Fund Statute, the Plaintiffs' effort to treble damages under a "civil theft" theory also fails. Colo. Rev. Stat. § 38-22-127(5) states: "Any person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18-4-401, C.R.S." Notably, that provision does not apply to the accounting requirement under Colo. Rev. Stat. § 38-22-127(5). But in any event, the cross-reference refers to the Colorado civil theft statute.

Colo. Rev. Stat. 18-4-401(1) states, in relevant part:

(1)     A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception . . . . and:

(a) Intends to deprive the other person permanently of the use or benefit of the thing of value;

(b) Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit;

(c) Uses, conceals, or abandons the thing of value intending that such use, concealment, or abandonment will deprive the other person permanently of its use or benefit; [or]

(d) Demands any consideration to which he or she is not legally entitled as a condition of restoring the thing of value to the other person . . . .

COLO. REV. STAT. 18-4-401(1)(a)-(d).  Per COLO. REV. STAT. 18-4-405, civil theft is a basis for obtaining treble damages.

Importantly, "liability for civil theft is not automatic upon a finding that a contractor has violated the TFS [Trust Fund Statute].  The Court must still independently find that the elements of theft under COLO. REV. STAT. 18-4-401 have been satisfied." *Adams v. Hernandez (In re Hernandez)*, 2014 WL 2609795, at *4 (Bankr. D. Colo. June 11, 2014).

The Colorado Supreme Court articulated the classic formulation for civil theft in *Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000):

. . . the owner of the property must prove that the taker or the defendant committed *acts* constituting at least one of the statutory crimes.  With respect to the crime of theft claimed here, all of its statutory elements must be proved, including the two culpable mental states: (1) that the defendant knowingly obtained control over the owner's property without authorization and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of property.  *See* § 18–4–401(1).  Only upon proof of the criminal act of theft may the owner recover treble damages, fees, and costs.

*Id*. (emphasis in original).  No proof of a prior criminal conviction is necessary.  *Id*. at 135.  It is evident from the text of the civil theft statute that civil theft requires proving "two culpable mental states":

(1) that the defendant knowingly obtained control over the owner's property without authorization; and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of the property.

*Itin*, 17 P.3d at 134.  And, the cause of action may only be pursued against "any person in whose possession he finds *the property*."  *In re Marriage of Allen*, 724 P.2d 651, 657 (Colo. 1986) (emphasis in original).

27

The Plaintiffs failed to meet the requirements for establishing civil theft (and thus, treble damages). The Plaintiffs seem to rely exclusively on the Trust Fund Statute as a basis for alleging civil theft. But, since the Court already rejected a Trust Fund Statute claim, the civil theft claim also fails. And, in any event, the Plaintiffs did not come close to establishing the required "two culpable mental states" for civil theft. Therefore, again, the Plaintiffs did not establish a valid debt.

### 2. The Plaintiffs Have Not Established Nondischargeability under Section 523(a)(4) or (a)(6).

Assuming for the moment that the Plaintiffs had been able to prove some amount of damages (which they did not), then, the Court would be required to assess the "dischargeability" component — is the valid debt nondischargeable under Sections 523(a)(4) or (a)(6)? *Thompson*, 555 B.R. at 8.

#### a. Section 523(a)(4).

The Plaintiffs have attempted to use the Trust Fund Statute as a basis for nondischargeability under both Sections 523(a)(4) or (a)(6). Section 523(a)(4) makes nondischargeable any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Of these statutory variants, the Plaintiffs assert only that the Defendants committed "defalcation while acting in a fiduciary capacity." The Trust Fund Statute generally creates a statutory trust which "satisfies the technical trust element of a fiduciary relationship necessary to establish a § 523(a)(4) claim." *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 49 (Bankr. D. Colo. 2014), *aff'd*, 541 B.R. 739 (D. Colo. 2015).

In *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), the Supreme Court addressed the meaning of "defalcation" in Section 523(a)(4) and what is required to show that a debtor committed defalcation while acting in a fiduciary capacity. More specifically, it was asked to decide whether the court was required to find that the debtor acted with a culpable state of mind.

Before *Bullock*, there was disagreement among courts as to "whether 'defalcation' includes a scienter requirement and, if so, what kind of scienter it requires." *Bullock*, 569 U.S. at 271. The Supreme Court noted that some lower courts had held that "even innocent acts of failure to fully account for money received in trust will be held as non-dischargeable defalcation; no intent to defraud is required." *Id.* (quoting *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009, 1018 (9th Cir. 2011)). Similarly, the Fourth Circuit had defined defalcation as

> "the failure to meet an obligation" or "a nonfraudulent default." To be defalcation for purposes of 11 U.S.C. § 523(a)(4), an act need not rise to the level of . . . "embezzlement" or even "misappropriation." Thus,

28

negligence or even an innocent mistake which results in misappropriation or failure to account is sufficient.

*Repub. of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) (internal citations omitted).  On the other side, the First Circuit had imposed a much higher "tort standard of recklessness."  *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 20 (1st Cir. 2002) ("Defalcation requires something close to a showing of extreme recklessness.").

    *Bullock* invoked several statutory interpretive tools to discern the meaning of defalcation.  Importantly, it looked to the "linguistic neighbors" of fraud and defalcation in Section 523(a)(4): embezzlement and larceny.  *Bullock*, 569 U.S. at 274-75 (citing Justice Harlan in *Neal v. Clark*, 95 U.S. 704, 709 (1877)).  *Bullock* drew from Justice Harlan's reasoning in *Neal* wherein the Court struggled to define the meaning of fraud for purpose of excepting a debt from discharge.

> We base our approach and our answer upon one of this Court's precedents.   In 1878, this Court interpreted the related statutory term "fraud" in the portion of the Bankruptcy Code laying out exceptions to discharge.  Justice Harlan wrote for the Court:
>
>> "[D]ebts created by 'fraud' are associated directly with debts created by 'embezzlement.' Such association justifies, if it does not imperatively require, the conclusion that the 'fraud' referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law which may exist without the imputation of bad faith or immorality."
>
> We believe that the statutory term "defalcation" should be treated similarly.

*Bullock*, 569 U.S. at 273 (quoting *Neal*).  In the end, *Bullock* rejected the notion that a fiduciary's innocent failure to account would be enough to find that a "defalcation" had occurred.   Instead, *Bullock* held defalcation requires a culpable state of mind (*i.e.* moral turpitude or intentional wrong).  The Court finds that the Plaintiffs failed to satisfy the state of mind requirement under Section 523(a)(4).

    **b.**    **Section 523(a)(6).**

    Section 523(a)(6) makes nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  As the text of the statute makes plain, nondischargeability under Section 523(a)(6) requires both a "willful injury" and a "malicious injury."  *Panalis v. Moore (In re Moore)*, 357 F.3d 1125,

1129 (10th Cir. 2004) ("Without proof of *both* [willful and malicious injury], an objection to discharge [under Section 523(a)(6)] must fail.") (emphasis in original); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 2022 WL 2679049, at *7 (10th Cir. July 12, 2022) (unpublished) ("to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury.").  Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' *and* 'malicious.'  Analyzing and applying 'willful' and 'malicious' separately is the better approach."  *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020) (emphasis in original).

According to the United States Supreme Court, to satisfy the willful injury part of Section 523(a)(6), the Plaintiffs must prove "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).  So the focus is whether the debtor acted with the "actual intent to cause injury."  *Id.*  "Willful" injury is a higher standard than "'reckless' or 'negligent'" injury.  *Id.*  Thus, "debts arising [merely] from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."  *Id.* at 64.   Explaining further, the Supreme Court observed that:

> [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require the actor to intend "the *consequences* of an act," not simply "the act itself."

*Id*. at 61-62 (emphasis in original).

To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur."  *Smith*, 618 B.R. at 912.  *See also Panalis,* 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'"); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Panalis* formulation of willful injury); *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, at *3 (10th Cir. 2020) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur.")  It is a subjective standard.  *Smith*, 618 B.R. at 912.

The standard for "malicious" injury is different than "willful" injury.  Something else is required.  But what?  The most recent binding appellate decision on Section 523(a)(6) puts it this way:

> [M]alicious injury requires "evidence of the debtor's motives."
> *In re Smith*, 618 B.R. 901, 919 (B.A.P. 10th Cir. 2020)

30

> (quotation marks omitted).  To be malicious, the debtor must
> have "acted with a culpable state of mind vis-à-vis the actual
> injury caused the creditor."  *Id.* (quotation marks omitted).
> The malicious injury requires that the action be "wrongful
> and without just cause or excuse."  *Id.*

*Bloom*, 2022 WL 2679049, at *7.  *See also Smith*, 618 B.R. at 919.  The Tenth Circuit
also explained:

> [P]ersonal animus is not a requirement for malicious injury.
> *Smith*, 618 B.R. at 919 (describing the requirements for
> malicious injury); *see also Ball v. A.O. Smith Corp.*, 451 F.3d
> 66, 69 (2d Cir. 2006) (explaining malicious injury means
> "wrongful and without just cause or excuse, even in the
> absence of personal hatred, spite, or ill-will (quoting *In re
> Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996)).

*Bloom*, 2022 WL 2679049, at *7.  So, malice can be shown if the injury was wrongful
and inflicted "without just cause or excuse."  *Wagner v. Wagner (In re Wagner)*, 492
B.R. 43, 55 (Bankr. D. Colo. 2014) (emphasis omitted), *aff'd*, 527 B.R. 416 (10th Cir.
BAP 2015); *Steward Software Co., LLC v. Kopcho (In re Kopcho)*, 2014 WL 3933657, at
*6 (Bankr. D. Colo. Aug. 12, 2014) (same).  In assessing the presence or absence of
"malicious injury," the totality of the circumstances must be examined.  *Dorr, Bentley &
Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993) ("all
the surrounding circumstances, including any justification or excuse offered by the
debtor, are relevant to determine whether the debtor acted with a culpable state of
mind" under Section 523(a)(6)); *Smith*, 618 B.R. at 919-20 (quoting *Pasek* "all the
surrounding circumstances" language; "the totality of the circumstances must be
examined" to decide whether the debtor committed malicious injury).

The application of the Section 523(a)(6) standards in this Adversary Proceeding
is not challenging.  With respect to willful injury, the Plaintiffs did not present evidence
that the Defendants acted with "actual intent to cause injury" to the Plaintiffs.  And,
nothing shows that the Defendants engaged in malicious injury either.  The Defendants
actions were not "wrongful and without just cause or excuse."  They had no evil motive
vis-à-vis the Plaintiffs.  Instead, GEM Homes entered into a series of contracts with the
Plaintiffs.  GEM Homes received the $51,000.00 Wire Transfer.  Then, GEM Homes
spent $103,667.00 on the Home Construction Project.  Although some work was done
(mainly the grading and foundation), the entire Home Construction Project was not
completed.  None of that shows malicious injury to the Plaintiffs by the Defendants.
Accordingly, the Court determines that the Plaintiffs have not met their preponderance
of the evidence burden to show nondischargeability under Section 523(a)(6).

**D.**     **The Plaintiffs Have Not Met Their Burden on their Fourth Claim: "Individual Liability for Each Other's Fraud" Under Section 523(a)(2)(A).**

In their Fourth Claim for Relief, the Plaintiffs assert:

> In accordance with *Strang v. Bradner*, 114 U.S. 555, 557-59 (1885) Gary Clasby and Kathleen Clasby are each liable for the fraud or the other and each one is precluded from discharging their liability to Fullers, regardless of their own culpability, because each of them was the agent and representative of [GEM Homes] with reference to the scope of [GEM Homes'] business and Gary Clasby and Kathleen Clasby both received and appropriated fruits of each other's fraudulent conduct in the business activities damaging Fullers.

(Compl. ¶ 65.)  The Fourth Claim for Relief also appears to be based exclusively on Section 523(a)(2)(A).

The Court confesses some confusion regarding the Fourth Claim for Relief.  It appears redundant in terms of relying on Section 523(a)(2)(A).  The First and Second Claims for Relief already asserted all three types of Section 523(a)(2)(A) variants.  And, the Court already has rejected nondischargeability under Section 523(a)(2)(A) against the Defendants.

Likely, the Fourth Claim for Relief is some sort of mechanism to try to capture Mrs. Clasby in the Plaintiffs' web if Mr. Clasby is determined to be the subject of nondischargeable debt.  In some sense, the Court understands why the Plaintiffs might want to spin another theory against Mrs. Clasby.  After all, the evidence against Mrs. Clasby was exceedingly thin.  Mrs. Clasby did not testify at trial.  The Plaintiffs only identified one non-material conversation between Mrs. Clasby and Mrs. Fuller.  Even the Plaintiffs do not allege that Mrs. Clasby herself made any specific misrepresentations.  Really, Mrs. Clasby's only involvement was that she executed the Second Contract and the Purchase Contract as a "Member" of GEM Homes.

Regardless, the Court rejects the Fourth Claim for Relief because at this stage, it is completely beside the point.  The Court already has determined that the Plaintiffs failed to establish a valid debt against *either* of the Defendants and failed to establish that any debt would be nondischargeable under Sections 523(a)(2)(A), (a)(4), or (a)(6).  So, there is no purpose served by trying to announce that Mr. Clasby and Mrs. Clasby are liable for "each other's" conduct.

## VI. Conclusion and Order

Based on facts as determined by the Court, and for the reasons stated above, the Court:

ORDERS that judgment shall enter in favor of the Defendants and against the Plaintiffs on all claims asserted in the Complaint.

DATED this 26th day of November, 2024.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge